448 A.2d 1139

**AMOCO OIL COMPANY, a Maryland corporation**

**v.**

**Ralph E. SNYDER, Ruth L. Snyder and Frank R. Crash.**

**Appeal of Ralph E. SNYDER & Ruth L. Snyder.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1981.

Decided July 30, 1982.

Petition for Allowance of Appeal Granted Feb. 8, 1983.

George H. Rowley, Greenville, for appellants.

Richard H. Martin, Pittsburgh, for appellee.

Before CAVANAUGH, MONTEMURO and VAN der VOORT, JJ.

VAN der VOORT, Judge:

This action was commenced by a complaint in equity, disposed of below by Judge Acker in favor of the plaintiff-appellees. The case was submitted to the court for decision on a written stipulation of facts.

The plaintiff-appellee Amoco Oil Company (Amoco) was engaged in producing, refining and marketing petroleum products. Ruth L. Snyder, the wife-defendant and one of the appellants is the owner of the real estate involved in this litigation, a 90′ × 100′ lot at the intersection of Main Street and College Avenue in Greenville, Pennsylvania, having a

474

brick gasoline service station erected on it. On August 2, 1968, Ruth L. Snyder and her husband, and other persons, then having an interest in the property, leased it to Amoco.[1] The term of the lease was for ten years, beginning April 1, 1969 and ending on March 31, 1979. The rental was $350 per month. Lessee was given an option to extend the lease for two successive periods of five years each at a rental of $400 per month.

The leasing agreement contained the following provisions:

3a.   Lessee shall have, and is hereby given, the option of purchasing said demised premises for the sum of FORTY FIVE THOUSAND_____DOLLARS ($45,000.00), provided Lessee shall give Lessor notice in writing of its election to exercise said option to purchase at any time during the original term or any extension or renewal thereof.

b.   It is further agreed that should Lessor, or Lessor's heirs, executors, grantees, successors or assigns, at any time during the term of this lease or any extension thereof, receive an offer to purchase the demised premises, or any part thereof, or any premises which includes the demised premises, and desires to accept said offer, or should Lessor during any such time make an offer to sell the demised premises, or any part thereof, or any premises which includes the demised premises, Lessor shall give Lessee ninety (90) days notice in writing of such offer, setting forth the name and address of the proposed purchaser, the amount of the proposed purchase price, and all other terms and conditions of such offer, and Lessee shall have the first option to purchase the premises which are the subject of the offer by giving written notice to Lessor of its intention to purchase within said ninety (90) day period at the same price and on the same terms of any such offer, it being understood

---

1.   The lease agreement consisted of a one-page typed "Lease"; a four-page partially printed "Agreement"; and a one-page "Lease Rider", all prepared by the lessee's predecessor.

that in the event Lessee does not give notice of its intention to exercise said option to purchase within said period, this lease and all of its terms and conditions shall nevertheless remain in full force and effect and Lessor and any purchaser or purchasers of the demised premises, or any part thereof, or any premises which includes the demised premises shall be bound thereby, and in the event that the premises set forth in the offer are not sold for any reason, Lessee shall have, upon the same conditions and notice, the continuing first option to purchase the demised premises, or any part thereof, or any premises which includes the demised premises, upon the terms of any subsequent offer or offers to purchase.

Amoco operated a gasoline service station on the premises until the spring of 1978, but not thereafter. The full rental had been paid to the Snyders through March 31, 1979, when the term was to expire. On November 15, 1978, the Snyders entered into a written agreement with Frank R. Crash, (a named defendant herein, but not represented, and inactive in the defense of the case) to sell him the property for $75,000.[2] On that same day the Snyders gave Amoco written notice of Crash's offer, pursuant to paragraph 3(b), quoted above. By letter dated January 8, 1979, Amoco, without making specific reference to the Snyders' letter of November 15, 1979, notified the Snyders of its intention to purchase the property for $45,000 in accordance with Paragraph 3(a), quoted above. The Snyders refused to transfer title to Amoco for the $45,000, claiming that Amoco's option to purchase at $45,000 was terminated by the notice of November 15, 1978 of the offer by Crash to purchase for $75,000.

Amoco's complaint in equity asked for an order directing the Snyders to execute and deliver a deed to Amoco upon

**2.** The Crash agreement states expressly that it is subject to the lease between the Snyders and Amoco, and that that lease gives Amoco a right to purchase.

tender of the option price of $45,000. Judge Acker's Decree Nisi and his subsequent Final Decree ordered the Snyders to execute and deliver a deed upon tender of $45,000; declared that the agreement of sale between Crash and the Snyders be set aside; and ordered the Snyders to not otherwise transfer or encumber the property.

It is the Snyders' position on appeal, as it was below, that Paragraph 3(a) of the Agreement (referred to in appellants' brief as a "fixed price option") and Paragraph 3(b) (referred to as a "first-purchase option") must be given equal stature, and that the "fixed price option" is terminated upon the giving of such notice of a third-party offer as is required to bring the "first purchase option" into operation. In support of appellants' argument they cite a number of cases from other jurisdictions,[3] and *Bobali Corp. v. Tamapa Co.*, 235 Pa.Superior Ct. 1, 340 A.2d 485 (1975), distinguished on its facts by Judge Acker in his opinion in the present case.

Appellants also argue that the terms of the "fixed price option" and of the "first purchase option" are, somehow, ambiguous and that the ambiguity must be resolved against Amoco since, admittedly, its predecessor prepared the leasing agreements. *West Penn Realty Co. v. Acme Markets, Inc.*, 224 Pa.Superior Ct. 202, 303 A.2d 836 (1973). We might agree with the general statement if the two options, considered together, appeared to be ambiguous. We agree, however, with Judge Acker that paragraphs 3(a) and (b) demonstrate no ambiguity when considered separately (Opinion, May 2, 1980, page 10) and do not become ambiguous because both options are present in the same instrument. (Id. at 11).

Paragraph 3(a), quoted above, unambiguously gives the lessee an option to buy the property for $45,000; the option may be exercised by written notice "at any time during the

3.  *Amoco Oil Co. v. Kraft*, 89 Mich.App. 270, 280 N.W.2d 505 (1979); *Tarrant v. Self*, 387 N.E.2d 1349 (Ind.1979); *Northwest Racing Ass'n v. Hunt*, 20 Ill.App.2d 393, 156 N.E.2d 285 (1959).

original term . . ." That option was exercised by Amoco on January 8, 1979, well within the original term.[4]

Paragraph 3(b) requires the lessors to give the lessee written notice of any proposed sale to a third party, and gives the lessee a ninety day option to buy the property at the same price and terms as the proposed sale. If the lessee does not pick up its option to purchase on that price and terms:

> "this lease and all of its terms and conditions shall nevertheless remain in full force and effect and Lessor and any purchaser . . . of the demised premises . . . shall be bound thereby. . . ."

We see nothing in paragraph 3(b) which supports appellants' argument, that if the lessors found a buyer willing to pay more than the fixed-price, $45,000, for the premises, then the lessee became obligated to buy at that larger price under penalty of losing its fixed-price option. It is important at this point to note that the option is given to the lessee, not to the lessor in both Paragraphs 3(a) and 3(b): at any time within the term of the lease "the lessee shall have the option of purchasing . . . . for $45,000", under 3(a); and under 3(b), on written notice from lessor, "Lessee shall have the first option to purchase" at the same price and terms as a third party offers.

We recognize that practically, and reasonably the lessee, faced with the problem of buying at $45,000 under 3(a), or buying at a larger price under 3(b) will opt to buy at the smaller price, as, in fact, Amoco did in the present case. The lessee had both those options under the Lease Agreements, for both of which options we must presume the lessors received an acceptable consideration when the Lease Agreements were executed.

**4.** It may reasonably be argued that Amoco elected to exercise this option only after, and because, it was notified that Crash was willing to buy the property for $75,000. If this be true, it tends to explain Amoco's motivation, but, as we see it, the fact that there was another interested buyer should not, and did not change Amoco's legal rights under the fixed price option.

*Bobali Corporation v. Tamapa Co.*, 235 Pa.Superior Ct. 1, 340 A.2d 485 (1975) is cited by appellants as a case holding that an optionee's failure to purchase pursuant to a right of first refusal extinguishes a fixed-price option. In *Bobali*, as Judge Acker pointed out below, the language of the option agreements and the attending circumstances were different than those involved in the present case. There the fixed-price option was stated to be two years and six months from April 13, 1971, "unless earlier terminated as hereinafter provided." Our Superior Court affirmed the lower court's determination that the intent of the parties in *Bobali*, because of the language quoted above, was that "the right of preemption would supersede and terminate the fixed price option". As we have previously noted, there was no such qualifying provision in the fixed-price option in the present case.

Further, in *Bobali* (235 Pa.Superior Ct. 1, at 9, 340 A.2d 485) unlike our case and other precedents cited to the court, the optionee had not occupied or improved the premises. Where such improvements did occur, as they did in this present case, although the dollar value of those improvements is disputed, our court recognized that

"it would be unfair to require the optionee to meet a third party's offer which would naturally reflect the improvements on the premises made by the optionee himself."

And, as Judge (now President Judge) Cercone stated in *Bobali*, 235 Pa.Superior Ct. at 9, 340 A.2d 485:

"In any event, it is obvious that dual option agreements . . . although often generally similar, are phrased differently, and, therefore a decision construing one agreement will not be controlling in a case involving another."

We believe that Judge Acker determined correctly the intent of the parties as expressed by the language in the option clauses and all the attendant circumstances.

Order affirmed.

MONTEMURO, J., concurs in the result.